**FILED**

### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

2008 MAY -6  P 4: 07

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| GRUNLEY WALSH U.S., LLC<br>1803 Research Boulevard<br>Suite 101<br>Rockville, MD 20850<br><br>      Plaintiff,<br><br>     v.<br><br>LOREN RAAP<br>1922 S. Arlington Ridge Road<br>Arlington, VA 22202<br><br>And<br><br>G-W MANAGEMENT SERVICES, LLC<br>11600 Nebel Street<br>Suite 202<br>Rockville, MD 20852<br><br>Serve:  Loren Raap<br>        1922 S. Arlington Ridge Road<br>        Arlington, VA 22202<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 1:08CV446<br>)     LOG /JFA<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Comes now Plaintiff Grunley Walsh U.S., LLC, by counsel, and for its eight count

Complaint against Loren Raap and G-W Management Services, LLC for unfair trade practices

and trademark infringement under the Lanham Act and common law, breach of fiduciary duty,

unjust enrichment, conversion, and fraud, states and alleges as follows:

## Parties, Jurisdiction, and Venue

1.      Plaintiff Grunley Walsh U.S., LLC ("GW") is a limited liability company formed under the laws of the State of Maryland and having its principal place of business at 1803 Research Boulevard, Suite 101, Rockville, MD 20850. All of the members of GW are citizens of the State of Maryland. GW is registered to do business in Virginia as a foreign limited liability company. GW is a successor in interest to The Grunley Walsh Joint Venture LLC and The Grunley Walsh, LLC.

2.      Defendant Loren Raap ("Raap") resides at 1922 S. Arlington Ridge Road, Arlington, VA 22202 and is a citizen of the Commonwealth of Virginia.

3.      Defendant G-W Management Services, LLC ("GWMS") is a Maryland limited liability company that regularly and generally does business in Virginia, Maryland, and the District of Columbia. Upon information and belief, the only member of GWMS is Loren Raap, a citizen of the Commonwealth of Virginia, who resides at 1922 S. Arlington Ridge Road, Arlington, VA 22202. GWMS is registered to do business as a foreign limited liability company in the Commonwealth of Virginia.

4.      The federal claims in this action arise under the Lanham Act, 15 U.S.C. § 1125(a).

5.      The citizenship of a limited liability company is based on the citizenship of its members. Based on the Maryland citizenship of the members of GW and the Virginia citizenship of both Raap and the sole member of GWMS, there is complete diversity among the parties to this action.

6.    The state law claims in this action arise under the common law breach of
fiduciary duty, conversion, common law fraud, as well as theories of common law trademark
infringement, and unfair competition practices.  The amount in controversy in each of these state
law claims exceeds $75,001.

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal
question), 1332 (diversity jurisdiction), 1338 (suit arising under copyright, federal trademark and
related unfair competition statutes), and/or 1367 (supplemental jurisdiction).

8.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 because (a) this is
the district where both Raap and GWMS reside; (b) a substantial part of the events or omissions
giving to the claims herein occurred in this judicial district; and (c) both Raap and GWMS are
subject to personal jurisdiction in this judicial district.

9.    GWMS is also subject to personal jurisdiction in the Commonwealth of Virginia
and in this judicial district because GWMS (a) regularly transacts business in this judicial
district; (b) contracts to supply services in this judicial district; (c) caused tortious injury by an
act or omission in this judicial district; (d) caused tortious injury by an act or omission outside of
the Commonwealth while regularly doing or soliciting business within this judicial district;
and/or (e) performed other acts covered by the Virginia Long Arm Statute, Va. Code Ann.
§ 8.01-328.1.

## FACTUAL ALLEGATIONS

### A.    General Nature of Grunley Walsh U.S., LLC's Business

10.    GW is one of the premier construction companies in the Metropolitan Washington DC area.

11.    GW is a full-service general contracting firm.  The predecessor to GW was first founded five decades ago by the noted Washington area construction companies of Grunley Construction, Inc. and William V. Walsh Construction, Inc.

12.    GW has vast knowledge of historic renovation, restoration, and preservation and has unrivaled area leadership in museum, memorial, federal, and other specialty construction settings.  GW also has extensive experience on secure facility projects.

13.    Over its five decades of existence, GW and its predecessors have established a reputation for superior quality, strong customer satisfaction, and as one of the premier construction companies in the Washington, DC metropolitan area.  This sterling reputation has been reflected in numerous industry and customer awards from organizations such as Associated Builders and Contractors, Associated General Contractors, Washington Building Congress, and others.  GW's reputation is based on and has fostered the growth of a network of strong relations with the owner and local subcontractor communities.

14.    The excellence and sterling reputation of GW is evident from sophisticated and high profile construction projects for which it has been the general contractor.  Some of these high profile projects include, but are not limited to, construction of the World War II Memorial on the National Mall, stabilization and preservation of the Washington Monument, restoration of the façade of the Old Patent Office Building, construction and renovation of the Federal Reserve Board buildings, Washington Metropolitan Area Transit Authority Metro Escalator Canopy

construction, Old Post Office Pavilion, as well as several projects at the White House, United

States Capitol, Library of Congress, Smithsonian Institution, and the National Gallery of Art.

**B.      Defendant Loren Raap's Tenure As President For Grunley Walsh U.S., LLC and
Duties He Owed to Grunley Walsh U.S., LLC**

15.     On or about December 18, 1997, GW hired Raap as its general manager.

Subsequently, GW named Raap president of GW.

16.     As president and/or general manager of GW, Raap was responsible for all aspects

of operating GW, including but not limited to identifying possible contracting opportunities,

preparing, calculating and submitting bids and/or proposals, project management, signing

checks, maintaining strong relationships with owners, subcontractors, engineers, and architects,

and financial management of all aspects of GW.

17.     As president and/or general manager of GW, Raap owed a fiduciary duty to GW,

including but not limited to the duties of utmost loyalty, good faith, and fair dealing to GW.

18.     Raap served as president and/or general manager of GW until May 30, 2007,

when GW terminated his employment.

**C.      Formation of G-W Management Services, LLC and Express
Limitations on Raap's Duties**

19.     Raap formed Grunley-Walsh Management Services, LLC as a project

management company to handle small construction and renovation projects which GW could not

bid on or perform.

20.     Grunley-Walsh Management Services, LLC was originally owned by Raap,

Kenneth Grunley (the owner of Grunley Construction, Inc.) and James V. Walsh (the owner of

William V. Walsh Construction Company, Inc.).

21.     In 2003, owners Grunley and Walsh sold their entire interests in Grunley-Walsh Management Services, LLC back to Raap and ceased to have any dealings or association with that limited liability company.  As part of his purchase of the company, Raap agreed to change the name of Grunley-Walsh Management Services, LLC and take other appropriate measures so as to avoid any confusion or perceived association by GW customers and the general public between Raap's company and GW.  Since selling their interests in the company shortly after its formation, neither the owners of GW nor GW itself have had any financial, managerial, ownership, or any other interest or control in GWMS.

22.     On or about September 8, 2003, Raap changed the name of Grunley-Walsh Management Services, LLC to G-W Management Services, LLC ("GWMS").

23.     At the time of GWMS's name change to its current name, GW reaffirmed its instructions to Raap that he could continue to own and operate GWMS while still employed as President of GW.  Raap, however, was instructed that his fiduciary duty and duty of loyalty lay with GW and that he was expected to give his work for GW priority over all other side activities he may have, including GWMS.  With the understanding that GWMS would be, at most, a very small company and one which would not require much of Raap's time or energies, Raap would be permitted to remain as president of GW provided that GWMS only bid on and performed work which GW was not eligible and for which GWMS could not compete against GW.  Raap acknowledged these limitations on his ability to own and operate his outside business.

24.     At the request of Raap and based on Raap's anticipated small volume of business that GWMS would likely conduct, GW agreed to allow GWMS and Raap to use GW clerical staff for minor and sporadic clerical support to GWMS, provided that GWMS fully reimburse GW for all GW employee time spent on non-GW work.

### D.   Raap's and GWMS's access to GW resources

25.     Raap initially operated GWMS from GW's office located in Rockville, Maryland, until GWMS moved to new offices in January 2007.

26.     Raap, as president and/or general manager of GW, had unrestricted access to GW's computer servers and office equipment.

27.     Raap, as president and/or general manager of GW, had unrestricted access to GW's project management, scheduling, and other software.

28.     Raap, as president and/or general manager of GW, had unrestricted access to GW's employees, including but not limited to accounting staff, technical proposal writers, project managers, and engineers.

29.     Raap, as president and/or general manager of GW, had unrestricted access to all of GW's proprietary documents and other valuable GW information not generally available to the public.  The documents and information included, but was not limited to, GW subcontract forms, GW bid documents, GW project experience documents, GW project references, GW quality control plans, GW personnel information and resumes, GW technical proposals, GW job safety plans, GW subcontractor lists, GW client logs, GW vendor lists, and GW financial information (collectively "GW Proprietary Information").

### E.   Raap and GWMS Divert Business Opportunities From GW

30.     GW only recently discovered that Raap used GW as a base of operations from which to grow GWMS as a direct competitor of GW and at the expense of GW.

31.     Raap, in his position as president and/or general manager of GW, was the primary point of contact for owners to contact GW with work opportunities.  Raap served a gatekeeper function and controlled the flow of all bidding opportunity information within GW.  Raap also

exercised significant discretion to determine which construction or renovation projects GW would bid on.

32.     From at least 2003 until his termination from GW in May 2007, Raap and GWMS submitted bids or proposals on construction and renovation projects in the Metropolitan Washington DC area.

33.     Many of the projects Raap and GWMS bid on from 2004 onward were projects or other work for which GW was eligible to have submitted bids or proposals and could have won the work, had Raap advised GW of the existence of such bidding opportunities. Among the many projects GWMS performed work on and for which GW could have submitted bids had Raap disclosed their existence included but were not limited to, Arlington Trade Center Phases I & II, Cosmos Club, and Ballston Parking Garage.

34.     The existence of many of the construction and renovation projects Raap and GWMS bid on was hidden and never disclosed by Raap to GW. As a result, GW was foreclosed from bidding on work for which it was eligible and capable of performing.

35.     GWMS successfully bid on and performed work on many projects for which GW was eligible, could have submitted bids and won the work, had Raap disclosed the existence of such bidding opportunities to GW.

### F.     Raap Neglected His GW Duties

36.     Over time, as Raap focused more and more of his time and attention on preparing bids and performing work for GWMS, performance of his duties with GW began to suffer.

37.     As a result of Raap's diversion from his duties on behalf of GW, GW's profits began to fall. At the same time GW's profits began to fall, GWMS's profits began to increase dramatically.

38.     Raap also paid less attention to GW projects, neglecting to provide proper oversight and management. Raap, claiming to be busy with other GW matters, would delegate oversight and management responsibility for failing projects to subordinate employees.

39.     Raap's neglect of GW projects directly and proximately resulted in GW being assessed contractual liquidated damages on projects that finished late as well as subjecting GW to lawsuits by owners and subcontractors.

**G.     Raap and GWMS Misappropriate GW Resources To Aid GWMS**

40.     Raap and GWMS took and used GW resources, without permission or authorization, when preparing GWMS bids on projects.

41.     Without permission or authorization, Raap and GWMS used GW's computer servers and office equipment for GWMS purposes.

42.     Without permission or authorization, Raap and GWMS used GW's project management, scheduling, and other software for GWMS purposes.

43.     Without permission or authorization, Raap and GWMS used GW proposals as templates for GWMS bids.

44.     Without permission or authorization, Raap and GWMS used and represented GW's project history as its own.

45.     Without permission or authorization, Raap and GWMS listed GW employees and their resumes as GWMS employees on GWMS bid documents. GWMS identified GW operations managers, project managers, safety managers, safety coordinators, engineers, and/or others as GWMS employees. GW employees, including but not limited to those listed above, were unaware that, while they were still GW employees, their names and resumes were submitted as GWMS employees. Such GW employees never gave Raap or GWMS permission to use their names in connection with GWMS. Similarly, GW was never aware of nor authorized

GWMS or Raap to list GW employees as GWMS employees. In many cases, the GW employees GWMS listed as its own never performed any work on the projects for which GWMS performed work.

46.     Raap and GWMS tasked GWMS work to GW employees without permission or authorization from GW. This resulted in GW employees being improperly diverted from their GW duties and job assignment by the President of GW for the express purpose of servicing his company, GWMS, and not for the benefit of GW.

47.     Without permission or authorization, Raap and GWMS used modified GW job safety plans and other proprietary GW documents as GWMS documents submitted in support of bids and/or proposals on federal projects and other work which GW could have bid on had Raap disclosed the existence of such prospective work to GW.

48.     Raap and GWMS used other GW resources without permission or authorization from GW.

49.     Raap, using his position as president and/or general manager of GW, concealed his and GWMS's knowing and intentional use of GW resources from the owners of GW.

50.     Neither Raap nor GWMS reimbursed GW for most of the GW resources they used without the prior authorization or permission of GW.

**H.     Infringement of Grunley Walsh U.S., LLC's service mark and tradename**

51.     As part of its bids on federal and other construction projects throughout the Washington, DC Metropolitan area, GWMS intentionally and deliberately attempted to trade off of GW's sterling reputation by creating the false impression that GWMS was a division of GW or otherwise closely affiliated with GW.

52.     As part of bid materials on projects, GWMS and Raap repeatedly and without the permission or authorization of GW used name "Grunley-Walsh" in the bid documents Raap misappropriated from GW and used as a template for GWMS's bid documents. After the 2003 name change, there was no reason or rational explanation for Raap's and GWMS's use of the name "Grunley Walsh" in any of GWMS's materials.

53.     GWMS and Raap repeatedly and without the permission or authorization of GW used the name "Grunley-Walsh" throughout contract bid and proposal documents that Raap and GWMS prepared to submit to owners for work on federal projects or other projects for which GW could have bid, had Raap disclosed the existence of such projects. After the 2003 name change, there was no reason or rational explanation for Raap's and GWMS's use of the name "Grunley Walsh" in any of GWMS's materials

54.     As part of bid and proposal materials, correspondence, and/or contract documents on projects, GMWS and Raap frequently, repeatedly and falsely represented that GWMS had a "shared management structure with Grunley-Walsh" and provided organizational charts which, without permission or authorization, listed key GW employees as part of the alleged "shared management structure."

55.     As part of bid and proposal materials, correspondence, and/or contract documents on projects, GMWS and Raap frequently, repeatedly, and falsely represented GW project experience on high profile projects such as the Washington Monument, Federal Reserve Bank, President's Park at the White House, U.S. Capitol, Bureau of Engraving and Printing and others as GWMS's project experience.

56.     As part of bid and proposal materials, correspondence, and/or contract documents on projects, GMWS and Raap frequently, repeatedly, and falsely represented key or high profile GW employees as actually being GWMS employees.

57.     As part of bid and proposal materials, correspondence, and/or contract documents on projects, GMWS and Raap falsely presented GW's job safety plan as their own, and left in numerous references to GW throughout such documents so as to falsely create the impression that GWMS and GW were somehow associated with each other.

58.     As part of their communications with actual or potential owners, customers, and subcontractors, GMWS and Raap provided GW telephone and fax numbers and provided other GW contact information to give the false impression that there was an association between GWMS and GW.

59.     Raap and GWMS also took other actions and made other written or oral statements to customers, owners, and/or subcontractors falsely suggesting a close and/or direct relationship between GW and GWMS, where none existed.

60.     As a result of the foregoing intentional, willful, and deliberate actions and attempts, as well as others, by Raap and GWMS to create an apparent affiliation between GWMS and GW, project owners and subcontractors, including but not limited to the Smithsonian Institution, U.S. General Services Administration, Nasatka Barriers, and Singleton Electric, actually and mistakenly believed that GWMS was a division of or otherwise closely affiliated with GW and have communicated their confusion to GW.

## I.     Raap Fraudulently Overstated Profits For GW

61.     As president and/or general manager of GW, Raap was generally responsible for financial management of GW and was solely responsible for reporting GW's gross profits and losses to the owners of GW.

62.     Raap reported gross profit on a per project basis.  GW's accounting department then aggregated Raap's gross profit figures and determined the net profit of GW for the year, subtracting from Raap's gross profit figures overhead and other objective and fixed costs.  The net profit figure was then used for federal and state tax purposes, as well as for determining owner and employee distributions of profits.

63.     Raap, at all times relevant from 2002 until his employment was terminated in 2007, was paid a nominal salary and was also paid a draw equal to one-third of GW's annual net profits.

64.     Due to the financial success of GW during the years 2002 and 2003, GW paid Raap a total draw of over $3,300,000 in 2002 and 2003 combined, reflecting one-third of GW's profits over that time period.

65.     Given the actual financial success of GW during the 2002 and 2003 timeframe, GW and its owners justifiably relied upon Raap's subsequent reports of GW profits.

66.     On December 17, 2004, Raap met with the owners of GW and its senior financial management and reported that GW had total 2004 gross profits of $2,687,000 on all pending construction and renovation projects.  Using Raap's report of gross profits, the GW accounting department determined that GW had a 2004 net profit of $1,694,000.

67.     As a direct result of the gross profit figures Raap reported, GW paid Raap a draw of $550,000, equaling approximately one-third of GW's net profits for 2004.

68.     The 2004 gross profit figures Raap reported to GW are false and materially misleading because GW's actual gross profits for 2004 were $959,000, meaning Raap overstated GW's gross profits on all pending construction and renovation projects by $1,728,000.  Applying the correct gross profit figures, GW actually had a net loss of $841,000 for 2004.

69.     On December 20, 2005, Raap met with the owners of GW and its senior financial management and reported that GW had total 2005 gross profits of $2,331,000 on all pending construction and renovation projects. Using Raap's report of gross profits, the GW accounting department determined that GW had a 2005 net profit of $675,000.

70.     As a direct result of the gross profit figures Raap reported, GW paid Raap a draw of $225,000, equaling one-third of GW's net profits for 2005.

71.     The 2005 gross profit figures Raap reported to GW are false and materially misleading because GW's actually had a gross loss for 2005 of $716,000, meaning Raap overstated GW's gross profits by $3,047,000 on all pending construction and renovation projects. Applying the correct gross profit figures, GW actually had a net loss of $2,377,000 for 2005.

72.     On December 12, 2006, Raap met with the owners of GW and its senior financial management and reported that GW had total 2006 gross profits of $3,865,000 on all pending construction and renovation projects. Using Raap's report of gross profits, the GW accounting department determined that GW had a 2006 net profit of $1,821,000.

73.     In reliance on the gross profit figures Raap reported for 2006, GW paid Raap a draw of $263,000 for 2006.

74.     The 2006 gross profit figures Raap reported to GW are false and materially misleading because GW's actually had a gross profit for 2006 of $2,055,000, meaning Raap overstated GW's gross profits by $1,810,000 on all pending construction and renovation projects. Applying the correct gross profit figures, GW actually had a net profit of $11,000 for 2006.

75.     On May 16, 2007, GW's outside accountant completed their review of GW's 2006 financial statements. As a result of the outside accountant's review of Raap's reported gross profit figures, GW readjusted the 2006 net profits to a net loss of $2,957,000.

76.     On May 16, 2007, Raap met with the owners of GW and its senior financial management and reported that GW would have 2007 gross profits of approximately $3,500,000. Raap's prediction of 2007 gross profits proved to be completely inaccurate.

77.     Raap deliberately, intentionally, and with actual malice, hid the true gross profit figures from GW, its owners, and senior financial management.

78.     As alleged herein, Raap acted with scienter in that Raap knew his representations of GW's gross profits were materially false and misleading; knew that GW's net profits would be calculated from the gross profits Raap reported; knew that Raap's compensation was based on one-third of GW's net profits; and knew that GW would report such net profits (as derived from the gross profits he reported) on its income taxes and pay taxes on such net profits. Raap acted with actual malice.

79.     GW reasonably and justifiably relied upon Raap's representations as alleged herein in calculating GW's net profits, paying Raap a draw based on one third of such net profits, and paying taxes on the net profits calculated using Raap's gross profit numbers. Had GW known the true gross profit figures for 2004, 2005, and 2006 before May 16, 2007, Raap's employment would have been terminated and corrective actions would have been taken to make GW a profitable company.

**J.**   **Grunley Walsh U.S., LLC's Loss Caused by Raap's and G-W Management Services, LLC's Actions**

80.     Raap's actions of diverting corporate opportunities, misuse of GW resources, neglect of his duties and other actions have directly and proximately caused damages and losses to GW in excess of Five Million Dollars ($5,000,000.00).

81.     As a direct and proximate result of Raap's materially false and misleading gross profit reports and GW's justifiable reliance on such materially false and misleading information, GW has been damaged by a loss of all bonding capacity and damages and losses in excess of Five Million Dollars ($5,000,000.00).

82.     Raap's and GWMS's actions and attempts to falsely create an association between GWMS and GW when none existed or was authorized, has proximately caused GW damages, including GW's lost profits as well as Raap's and GWMS improperly gained profits due to their unfair competition and trademark infringement.

### COUNT I
### FEDERAL UNFAIR COMPETITION
### UNDER 15 U.S.C. 1125(a)

83.     Plaintiff incorporates by reference paragraphs 1 through 82 as if fully set forth herein.

84.     This is a claim for federal unfair competition and false designation of origin arising under the Lanham Act, Title 15 U.S.C. § 1125(a).

85.     GWMS engaged in Unfair Competition and False Designation of Origin by misrepresenting or palming off Plaintiff's services as its own.

86.     GWMS's actions have caused actual consumer confusion and are likely to continue to cause confusion as to the origin of the services.

87.     GWMS knowingly and willfully used and continues to use Plaintiff's service mark, thereby falsely advertising and misrepresenting to its customers that its services are those of Plaintiff, or sponsored by or affiliated with Plaintiff's services.

88.     GWMS's actions complained of herein have injured and will continue to injure GW.  Plaintiff has sustained, and will continue to sustain, substantial injuries, loss and damage to its business, reputation and good will, entitling it to an award of damages, an injunction to prohibit such acts in the future, and attorney's fees and costs.

89.     GMWS's actions complained of herein were intentional, willful, and malicious warranting the imposition of treble damages.

**COUNT II**
**FEDERAL TRADEMARK INFRINGEMENT**
**UNDER 15 U.S.C. 1125(a)**

90.     Plaintiff incorporates by reference paragraphs 1 through 89 as if fully set forth herein.

91.     This is a claim for federal trademark infringement arising under the Lanham Act, Title 15 U.S.C. § 1125(a).

92.     GWMS engaged in trademark infringement by using the plaintiff's tradename Grunley Walsh in its marketing materials, bids, bid documents, and other contract documents.

93.     GWMS's actions have caused actual consumer confusion and are likely to continue to cause confusion as to the origin of the services.

94.     GWMS knowingly and willfully used and continues to use Plaintiff's tradename, thereby misrepresenting to its customers that its services are those of Plaintiff, or sponsored by or affiliated with Plaintiff's services.

95.     GWMS's actions complained of herein have injured and will continue to injure

GW. Plaintiff has sustained, and will continue to sustain, substantial injuries, loss and damage to

its business, reputation and good will, entitling it to an award of damages, an injunction to

prohibit such acts in the future, and attorney's fees and costs.

96.     GMWS's actions complained of herein were intentional, willful, and malicious

warranting the imposition of treble damages.

**COUNT III**
**COMMON LAW TRADEMARK INFRINGEMENT**

97.    Plaintiff incorporates by reference, as if fully set forth herein, the allegations in

Paragraphs 1 through 96 of this Complaint.

98.    This is a claim for common law trademark infringement.

99.    Plaintiff owns and uses the service mark Grunley Walsh in connection with its

construction services.

100.   Despite its knowledge of Plaintiff's prior use of the Grunley Walsh mark for the

same services, GWMS uses the name Grunley Walsh and G-W Management Services in

connection with its construction services.

101.   GWMS's use of the mark Grunley Walsh is intended to mislead consumers, has

caused actual confusion amongst consumers and is likely to continue to cause confusion with

Plaintiff's services.

102.   GWMS's acts, which were done in bad faith and with actual malice, constitute

common law trademark infringement.

103. GWMS's infringement of the Grunley Walsh mark has caused, and is causing, irreparable harm and damages to GW. Unless this Court enjoins GWMS from continuing its unauthorized use of the Grunley Walsh mark, GW will continue to suffer irreparable harm and damages.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION

104. Plaintiff incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 103 of this Complaint.

105. This is a claim for common law unfair competition.

106. Plaintiff owns and uses the service mark Grunley Walsh in connection with its construction services.

107. Despite its knowledge of Plaintiff's prior use of the Grunley Walsh mark for the same services, GWMS uses the name Grunley Walsh in connection with its construction services.

108. GWMS's use of the mark Grunley Walsh and false association created between GWMS and GW is intended to mislead consumers, has caused actual confusion amongst consumers and is likely to continue to cause confusion with Plaintiff's services.

109. GWMS's acts, which were done in bad faith and with actual malice, constitute unfair competition under common law.

110. GWMS's infringement of the Grunley Walsh service mark has caused, and is causing, irreparable harm and damages to GW. Unless this Court enjoins GWMS from continuing its unauthorized use of the Grunley Walsh service mark, GW will continue to suffer irreparable harm and damages.

## COUNT V
## BREACH OF FIDUCIARY DUTY

111.     Plaintiff incorporates by reference paragraphs 1 through 110 as if fully set forth herein.

112.     Raap, as President of GW, owed a fiduciary duty and duty of loyalty to GW. Among the duties Raap owed to GW was the duty to disclose actual or potential conflicts of interest, not to compete through GWMS against GW, to disclose all corporate or contracting opportunities available to GW, and to deal openly and honestly with GW in all matters.

113.     Through the acts alleged herein defendant Raap breached his fiduciary duties to plaintiff GW by neglecting his duties to GW, diverted or hid corporate opportunities from GW, misused GW resources and employees for his own personal gain, and otherwise failed and refused to act in the sole interests of GW during the time that he was the President of GW.

114.     All of the actions Raap took to breach his fiduciary duty to GW were taken knowingly, intentionally, and with actual malice.

115.     As a direct consequence of Raap's breach of fiduciary duty, the plaintiff has suffered monetary and other damages.

## COUNT VI
## UNJUST ENRICHMENT

116.     Plaintiff incorporates by reference paragraphs 1 through 115 as if fully set forth herein.

117.     Raap's and GWMS's use of GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects, conferred a benefit on Raap and GWMS without payment therefore.

118.    Raap and GWMS appreciate and have knowledge of the benefit they received from the use of GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects.

119.    The acceptance and retention by Raap and GWMS of the benefit of the use of GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects, without payment of its value is inequitable to GW and constitutes an unjust enrichment to Raap and GWMS.

120.    Raap and GWMS acted with actual malice to obtain benefits from GW without compensation to GW.

121.    GW has been damaged by Raap's and GWMS's unjust enrichment.

**COUNT VII**
**CONVERSION**

122.    Plaintiff incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

123.    By virtue of their actions of using and receiving GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects, Raap and GWMS have exerted dominion or ownership over GW's personal property.

124.    Raap's and GWMS's use of GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects, deprived GW of the use of its resources.

125.    Raap and GWMS intended to exercise dominion or control over GW computer servers, office equipment, project management, scheduling and other business software, GW's Proprietary Information, and/or receipt of the benefit of GW's employees labors on GWMS projects, in a manner inconsistent with GW's rights to such personal property.

126.    Raap and GWMS committed the foregoing actions with actual malice.

127.    GW has been damaged by Raap's and GWMS's conversion of GW's personal property and GW's damages were proximately caused by such conversion.

**COUNT VIII**
**COMMON LAW FRAUD**

128.    Plaintiff incorporates by reference paragraphs 1 through 128 as if fully set forth herein.

129.    Raap made false representations of material fact to GW.

130.    The falsity of these representations was either known to Raap or made with reckless indifference as to their truth.

131.    Raap's misrepresentations to GW were made for the purpose of misleading or defrauding GW.

132.    GW relied upon, and had a right to rely upon, Raap's misrepresentations.

133.    As a direct and proximate result of defendants' misrepresentations, GW suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Grunley Walsh U.S., LLC prays that the Court:

(a)     Enter judgment that G-W Management Services, LLC and/or Loren D. Raap has committed federal unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(b)     Enter judgment that G-W Management Services, LLC and/or Loren D. Raap has infringed Grunley Walsh U.S., LLC's trademarks under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a);

(c)     Enter judgment that G-W Management Services, LLC and/or Loren D. Raap committed common law trademark infringement and common law unfair competition;

(d)     Enter judgment that Loren Raap breached his fiduciary duties to Grunley Walsh U.S., LLC;

(e)     Enter judgment that Loren Raap and G-W Management Services, LLC were unjustly enriched;

(f)     Enter judgment that Loren Raap and G-W Management Services, LLC converted Grunley Walsh U.S., LLC's personal property;

(g)     Enter judgment that Loren Raap and G-W Management Services, LLC defrauded Grunley Walsh U.S., LLC;

(h)     Award Grunley Walsh U.S., LLC compensatory damages against G-W Management Services, LLC and Loren D. Raap, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including appropriate statutory interest thereon;

(i)      Award Grunley Walsh U.S., LLC exemplary, or treble, damages, to the fullest extent permitted by statute, on Counts I and II;

(j)      Award Grunley Walsh U.S., LLC punitive damages on Counts III, IV, V, VI, VII, and VIII;

(k)      Order Loren Raap and G-W Management Services, LLC to disgorge all profits and compensation earned from their illegal or tortious conduct and award Grunley Walsh U.S., LLC all such disgorged profits;

(l)      Order Loren Raap and G-W Management Services, LLC to make an accounting of all income earned through or as a result of their illegal or tortious conduct;

(m)      Order the creation of a constructive trust for all income Loren Raap and G-W Management Services, LLC earned and continue to earn through their illegal or tortious conduct;

(n)      Preliminarily and permanently enjoin Loren Raap and G-W Management Services, LLC from infringing Grunley Walsh U.S., LLC's service marks and engaging in unfair trade practices;

(o)      Award Grunley Walsh U.S., LLC reasonable attorneys' fees, costs and expenses incurred in this action; and

(p)      Award Grunley Walsh U.S., LLC such other legal or equitable relief as the Court deems just and proper.

GRUNLEY WALSH U.S., LLC
By Counsel

Michael J. Schrier (VSB #65916)
Andrew N. Cook (VSB #39475)

Of Counsel:
Lawrence M. Prosen, Esq.
Christopher S. Adkins, Esq.
Attorneys for Grunley Walsh U.S., LLC
BELL, BOYD & LLOYD, LLP
1615 L Street, N.W., Suite 1200
Washington, DC  20036
202-955-6821 tel.
202-835-4135 fax
mschrier@bellboyd.com