IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

GRUNLEY WALSH U.S., LLC,                )
                                        )
      Plaintiff,                     )
                                        )
v.                                      )     Civil Action No.: 1:08-cv-446
                                        )
LOREN RAAP, *et al.*,                   )
                                        )
      Defendants.                    )

## MEMORANDUM OPINION

Plaintiff Grunley Walsh U.S., LLC ("Grunley Walsh U.S.") commenced this lawsuit against Defendants Loren Raap and G-W Management Services on May 6, 2008, after an employment relationship between high level executives at a construction company deteriorated. Defendants responded by filing their own counterclaims. Both Plaintiff and Defendants eventually moved for summary judgment. On April 14, 2009, the Court issued an Order denying Plaintiff's summary judgment motion and granting Defendants' in part. This Memorandum Opinion provides further reasoning for the Court's Order.

The issue presented herein is whether a contract barred Grunley Walsh U.S. from asserting the claims it filed in this action. The Court holds that Grunley Walsh U.S.'s claims are barred by contract, but only to the extent that they arose from facts occurring before November 6, 2007. However, for the reasons explained below, none of Grunley Walsh U.S.'s claims are supported by facts arising after November 6, 2007. Therefore, all of the claims asserted by Grunley Walsh U.S. in this action shall be dismissed in their entirety.

# I. FACTS[1]

*i. The Grunley Walsh and G-W Management Services Company Backgrounds*

The Grunley Walsh entity is a well known construction and renovation company based in the Washington, D.C. area. This company, along with its predecessors in interest, have performed work on high-profile structures such as the World War II Memorial, the Washington Monument, the White House, the Capitol, the Library of Congress, the Smithsonian Institution, and the National Gallery of Art.

In 1998, Kenneth Grunley, owner of Grunley Construction Co., and James Walsh, owner of William V. Walsh Construction, Inc., merged their two companies and formed Grunley Walsh Joint Venture, LLC ("Grunley Walsh Joint Venture"). In that same year, Mr. Grunley and Mr. Walsh hired Mr. Raap, a longtime government employee in the construction field, to be the president and general manager of their new company. Between 1998 and 2006, the Grunley Walsh entity underwent two name changes. First, Grunley Walsh Joint Venture became The Grunley Walsh, LLC, and then Grunley Walsh International, LLC ("Grunley Walsh International"). Throughout these changes, Mr. Grunley and Mr. Walsh maintained ownership of the Grunley Walsh entity.

Grunley Walsh historically has performed large-scale construction projects. In 2000, however, the company decided to enter the market for small business set-aside work. In pursuit of this goal, and in an attempt to comply with small business regulations, Mr. Raap, Mr. Grunley, and Mr. Walsh formed a new company called Grunley-Walsh Management Services, LLC. The ownership structure of this new company was as follows: Mr. Grunley and Mr. Walsh each owned 24.5%, and Mr. Raap owned 51%. In 2002, Mr. Grunley and Mr. Walsh sold their

---

[1]       As required, the following facts are viewed in the light most favorable to the plaintiff. *See infra* Section III., Standard of Review.

interests in Grunley Walsh Management Services, LLC to Mr. Raap.  Around this time, Mr. Raap, at the request of Mr. Grunley and Mr. Walsh, changed the name of Grunley-Walsh Management Services, LLC to G-W Management Services, LLC ("GWMS") to avoid name confusion and potential small business regulation violations.

Mr. Raap maintained his position as President and General Manager of the Grunley Walsh entity while he owned and operated GWMS.  Additionally, with the consent of Mr. Grunley and Mr. Walsh, Mr. Raap ran GWMS out of the Grunley Walsh offices, utilizing Grunley Walsh personnel and office equipment.  GWMS and Grunley Walsh executed a contract to govern this dynamic.  The parties operated under this arrangement until Mr. Raap moved his GWMS company to a different location in January of 2007.[2]

Mr. Grunley and Mr. Walsh eventually became concerned that Mr. Raap was engaging in improper conduct while operating GWMS, such as using the GRUNLEY-WALSH mark without permission to acquire government construction projects for GWMS.[3]  Furthermore, Mr. Grunley and Mr. Walsh believed that Mr. Raap intentionally diverted business opportunities from Grunley Walsh to GWMS.  As a result, Mr. Grunley and Mr. Walsh fired Mr. Raap from his position of President and General Manager of Grunley Walsh in May of 2007.

*ii.  The Membership Interest Purchase Agreement*

---

[2]      Mr. Raap continued to work as President and General Manager of Grunley Walsh after this move.

[3]      Specifically, Grunley Walsh alleges that Raap and GWMS willfully and repeatedly used the GRUNLEY-WALSH mark in all of its email communications through January 2007, submitted proposals with government agencies in the name of "Grunley Walsh Management Services," signed subcontracts with subcontractors identifying the prime contractor as "Grunley Walsh," and otherwise made liberal use of the GRUNLEY-WALSH mark in connection with GWMS's construction and renovation services.

3

In 2006, Mr. Grunley and Mr. Walsh began exploring a sale of the Grunley Walsh entity to First Kuwaiti, a construction company that had been involved in building U.S. embassies overseas.[4]  On December 23, 2006, the ownership of The Grunley Walsh, LLC and Mr. Farah, a representative for First Kuwaiti, reached a deal called the Membership Interest Purchase Agreement.  The deal was intended, in large part, to transfer the international segment of the Grunley Walsh entity to Mr. Farah, and leave the domestic business with Mr. Grunley and Mr. Walsh.

In order to accommodate this international and domestic division of property, Mr. Grunley and Mr. Walsh restructured their corporate framework.  First, they changed the name of The Grunley Walsh, LLC to Grunley Walsh International.  Then they used Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co. to create a new entity called Grunley Walsh U.S.[5]  The parties intended, for the most part, to allocate the international business to Grunley Walsh International and the domestic business to Grunley Walsh U.S.

The closing date for the Membership Interest Purchase Agreement was November 6, 2007.  It contained a "Retained Property" provision listing which property was to remain with Grunley Walsh International.[6]  In other words, the Retained Property provision provided the interests purchased by Mr. Farah.  The property not included in the Retained Property provision was to be transferred back to Grunley Walsh U.S. through an assignment clause.[7]

---

[4]     At this point in time, the Grunley Walsh entity was operating under The Grunley Walsh, LLC name.

[5]     Mr. Grunley and Mr. Walsh formed Grunley Walsh U.S. on paper on or about December 15, 2006 in anticipation of entering into the Membership Interest Purchase Agreement, but the entity did not begin operation until January 1, 2007.

[6]     *See Schedule 1.1*, MEMBERSHIP INTEREST PURCHASE AGREEMENT, A41 (November 6, 2007).

[7]     *See Assignment and Assumption*, MEMBERSHIP INTEREST PURCHASE AGREEMENT, A72 (November 6, 2007) ("[E]ffective as of the date hereof, [Grunley Walsh International]

Importantly, the Membership Interest Purchase Agreement contained a liability release. This specific provision was called the "Sellers' Release," and was signed by both Mr. Grunley and Mr. Walsh. The release identifies the "Sellers" as Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co., the two entities owned by Mr. Grunley and Mr. Walsh, respectively. The release also refers to Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co. as the sole owners of the "Company," which is Grunley Walsh International. The "Buyer" is Robert Farah. The Sellers represented in the release language itself that the release is supported by consideration.

The Sellers' Release states, in pertinent part, the following:

> Each Seller, on behalf of itself and each of its legal representatives, affiliates, successors and assigns, and each of such legal representatives', affiliates', successors' and assigns' Representatives (collectively, the "Related Parties"), hereby releases and forever discharges Buyer, the Company and each of their respective individual, joint or mutual, past, present and future Representatives, affiliates, stockholders, members, controlling persons, successors and assigns (individually, a "Releasee" and collectively, "Releasees"), from any and all claims, demands, Proceedings, causes of action, Orders, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which such Seller or any of its Related Parties now has, has ever had or may hereafter have against the respective Releasees arising at any time prior to the Closing or on account of or arising out of any matter, cause or event occurring at any time prior to the Closing, including, but not limited to, any rights to indemnification or reimbursements from the Company, whether pursuant to the Organizational Documents, contract or otherwise and whether not relating to claims pending on, or asserted after, the Closing Date; provided however, that nothing contained herein shall operate to release any obligations of Buyer arising under the Agreement or the Ancillary Agreements, including the Closing

hereby sells, conveys, assigns, transfers, and delivers to [Grunley Walsh U.S.], and [Grunley Walsh U.S.] hereby purchases, accepts and takes from [Grunley Walsh International] all right, title and interest in and to all of the contracts and assets of [Grunley Walsh International] except for the Retained Property").

> Letter Agreement dated November 6, 2007. Each Seller hereby represents and warrants that it has no knowledge of any right to indemnification from the Company as of the date of this Release, except as stated in the Closing Letter Agreement dated November 6, 2007.
>
> Each Seller, on behalf of such Seller and each of such Sellers' Related Parties, hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee based upon any matter released hereby.

*Sellers' Release*, MEMBERSHIP INTEREST PURCHASE AGREEMENT (November 6, 2007).

Some terms in the Sellers' Release are defined in other areas of the Membership Interest Purchase Agreement. Specifically, "Representatives" is defined as follows: "'Representative' means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors." "Person" means "any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body."[8]

### iii. Procedural Posture

Grunley Walsh U.S. filed its initial Complaint against Mr. Raap and GWMS on May 6, 2008. On August 19, 2008, however, Grunley Walsh U.S. filed an Amended Complaint. This Amended Complaint asserted the following claims:

Count I: Federal Unfair Competition under 15 U.S.C. § 1125(a);

Count II: Federal Trademark Infringement under 15 U.S.C. § 1125(a);

Count III: Common Law Trademark Infringement;

---

[8]     These definitions are found in the "1. Definitions" section of the Membership Interest Purchase Agreement.

6

Count IV: Common Law Unfair Competition;

Count V: Breach of Duty of Loyalty and Usurpation of Corporate Opportunities;

Count VI: Common Law Fraud;

Count VII: Negligent Misrepresentation;

Count VIII: Unjust Enrichment; and

Count IX: Breach of Contract

On February 10, 2009, Grunley Walsh U.S. voluntarily dismissed Counts VI and VII with

prejudice. Mr. Raap and GWMS responded to Grunley Walsh U.S.'s Amended Complaint by

filing Counterclaims of their own. Specifically, Mr. Raap and GWMS asserted the following:

Counterclaim Count I: Tortious Interference with Contract

Counterclaim Count II: Tortious Interference with Business Expectations

Counterclaim Count III: Attorneys' Fees

Both sides moved for summary judgment in February 2009. As mentioned above, the Court's

April 14, 2009 Order denied Grunley Walsh U.S.'s motion and granted Mr. Raap and GWMS' in

part.

## II. JURISDICTION AND VENUE

This Court has jurisdiction over the claims in this action under 28 U.S.C. § 1331 (federal

question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). Furthermore, the parties

agree that this Court has personal jurisdiction over the Defendants, and that venue in the Eastern

District of Virginia is proper.

### III. STANDARD OF REVIEW

As mentioned above, the Court issued its April 14, 2009 Order in response to summary judgment motions. Summary judgment should be granted where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained, a fact is "'material' only if it might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587-88 (1986).

### IV. ANALYSIS

The Court will first address why the Sellers' Release bars Grunley Walsh U.S. from filing claims against Mr. Raap and GWMS to the extent those claims arose from facts occurring before the November 6, 2007 closing date. The Court shall also address, in this section, why none of Grunley Walsh U.S.'s claims can be supported by facts occurring after November 6, 2007.

#### A. Whether the Sellers' Release issue was Pled Properly in this Case

Grunley Walsh U.S. argues that Mr. Raap and GWMS waived their ability to rely on the Sellers' Release because the "release" affirmative defense was not pled in the answer. *See* Fed. R. Civ. P. 8(c) (requiring a party to "affirmatively state any avoidance or affirmative defense, including . . . release" at the pleading stage). Grunley Walsh U.S. asserts that Mr. Raap and GWMS's failure to properly plead the release defense prevented it from obtaining adequate

notice that the Sellers' Release would be at issue in this suit. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1274 (3d ed. 2004) ("an affirmative defense . . . will be held to be sufficient . . . as long as it gives the plaintiff fair notice of the nature of the defense.").

Indeed, Mr. Raap and GWMS did not specifically plead "release" as an affirmative defense in their answer and never sought to amend that answer. However, they did plead in their Sixth Affirmative Defense that "Plaintiff's common law tort claims are barred by contract." *See Virginia Impressions Prods. Co. v. SCM Corp.*, 448 F.2d 262, 265 (4th Cir. 1971) ("A release is just another contract in which the intent of the parties is to be derived from the face of the instrument viewed as a whole."). Mr. Raap and GWMS also pled in their Thirteenth Affirmative Defense that "[p]laintiff's claims . . . are barred by accord and satisfaction."[9]    The Court believes that these affirmative defenses pled by Mr. Raap and GWMS put Grunley Walsh U.S. on sufficient notice, especially under the lenient notice-pleading standards of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(e), (f) (providing that "[n]o technical forms of pleading or motions are required" and that "[a]ll pleadings shall be so construed as to do substantial justice"). Specifically, these defenses convey to Grunley Walsh U.S. that Mr. Raap and GWMS believed a contract existed that barred the claims filed in this suit. Critically, the contract that ended up having this effect, the Sellers' Release, was part of the Membership Interest Purchase Agreement, which was executed by Grunley Walsh U.S itself and signed by Mr. Grunley and Mr. Walsh. This fact substantially strengthens the nexus between the two defenses asserted in

---

[9]    *See* BLACK'S LAW DICTIONARY 17 (8th ed. 2004) (defining "accord and satisfaction" as "[a]n agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance").

the answer, and Grunley Walsh U.S. knowing of the contract to which those defenses refer. Because the defenses pled in the answer adequately put Grunley Walsh U.S. on notice that the Sellers' Release could be at issue in this suit, the Court concludes that Mr. Raap and GWMS sufficiently pled the release issue in their answer.

Even if the Sellers' Release defense was not pled properly in the answer, the law still permits the Court to address this issue because of the subsequent developments in this case. "Generally, when a party fails to raise an affirmative defense in its answer, it waives the defense." *Vermont Mut. Ins. Co. v. Everette*, 875 F.Supp. 1181, 1189 (E.D. Va. 1995). "However, the majority of federal circuit courts have held that when a defendant raises an affirmative defense in a manner that does not result in unfair surprise to the other party, noncompliance with Rule 8(c) will not result in waiver of the affirmative defense." *Id.* (citing *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993)); *see also Holland v. Cardiff Coal Co.*, 991 F.Supp. 508, 515 (S.D. W. Va. 1997) (quoting *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855-56 (5th Cir.1983)) (Where an affirmative defense "is raised in the trial court in a manner that does not result in unfair surprise . . . technical failure to comply precisely with Rule 8(c) is not fatal."); *Steinberg v. Columbia Pictures Indus., Inc.*, 663 F.Supp. 706, 715 (S.D.N.Y.,1987) (citing *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir.1984)) ("Although Fed.R.Civ.P. 8(c) generally requires affirmative defenses to be pleaded, courts have been more lenient in the context of motions for summary judgment. '[A]bsent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.'").

Indeed, the Fourth Circuit addressed a qualified immunity affirmative defense not filed in the answer where the plaintiff suffered no prejudice from the later filing and was provided with

an opportunity to brief the relevant issue before the appellate court. *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305-306 (4th Cir. 2006). The Court in *Ridpath* explained that consideration of the untimely pled defense served the strong public policy of economizing the use of judicial resources and avoiding relitigation. *Id.* On the other hand, the Fourth Circuit declined to address a qualified immunity defense when the defense was not pled until the defendant's summary judgment reply brief. *See Noel v. Artson*, 297 Fed. Appx. 216, 219 (4th Cir. 2008) (unpublished). The Court in *Noel* reasoned that a defense pled so late in the process prejudiced the plaintiffs because they "had no chance to address the issue in their opposition to summary judgment." *Id.* Furthermore, the Court explained, "Considering an argument advanced for the first time in a reply brief . . . entails the risk of an improvident or ill-advised opinion . . . ." *Id.* (citing *McBride v. Merrel Dow & Pharms., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986)).

Here, Grunley Walsh U.S. would not be prejudiced or unfairly surprised even if Defendants' answer failed to put it on adequate notice of the Sellers' Release issue. Specifically, Mr. Raap and GWMS took steps very early in the litigation that should have made Grunley Walsh U.S. aware that the Sellers' Release could be an issue in the suit. Indeed Mr. Raap and GWMS subpoenaed Mr. Farah near the beginning of the discovery period and requested that he produce all documents relating to his acquisition of Grunley Walsh International. This request clearly could have been conceived as covering the Membership Interest Purchase Agreement and Sellers' Release. Then, nearly a month before Mr. Raap and GWMS filed their brief in support of their motion for summary judgment, they submitted an exhibit list to this Court naming the Sellers' Release as an exhibit. This exhibit list was available to Grunley Walsh U.S. Finally, and most importantly, Mr. Raap and GWMS asserted their "Sellers' Release" defense in their brief in support of their motion for summary judgment. Grunley Walsh U.S. then replied in

11

detail to the Sellers' Release argument, dedicating over five pages to the matter in its opposition brief. For these reasons, the Court finds that even if the release defense was not pled properly in the answer, the manner in which the defense was raised and addressed by the parties in this case was not prejudicial to Grunley Walsh U.S.[10]

Because Mr. Raap and GWMS adequately pled the release issue in the answer, and since Grunley Walsh U.S. was not prejudiced or unfairly surprised by the Court's consideration of the release issue at this stage of the litigation, the Court shall permit Mr. Raap and GWMS to rely on the Sellers' Release in this case.

## B. Contract Law Applied to the Sellers' Release[11]

A valid contract requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (1979); *see e.g., Audio Visual Assocs., Inc. v. Sharp Elec. Corp.*, 210 F.3d 254, 258 (4th Cir. 2000). Here, Mr. Grunley and Mr. Walsh promised Mr. Farah, *inter alia*, that they would sell Mr. Farah an ownership interest in their Grunley Walsh entity and that they would surrender their right to bring claims against certain entities and individuals. In return for these promises, Mr. Farah paid money. For these reasons, the Sellers' Release is a valid, bargained for contract supported by consideration.

Next, a "fundamental goal of contract law is to uphold clearly ascertained and negotiated contract rights." *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 400 (6th Cir. 2000) (citing *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F.Supp. 1198, 1203 (W.D.

---

[10]    For these same reasons, the Court would have granted a request by Mr. Raap or GWMS to amend the answer if such a request was made.
[11]    Pursuant to the Virginia choice of law provision contained in the final paragraph of the Sellers' Release, Virginia law applies to the following interpretation.

Ky.1995). Furthermore, "[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." *West v. Liberty Mutual Ins. Co.*, 1994 WL 399140 at *2 (4th Cir. 1994) (unpublished opinion) (quoting *Riggle v. Allied Chem. Corp.*, 378 S.E.2d 282 (W. Va. 1989)). The Sellers' Release was an agreement between parties with bargained-for consideration designed to prevent future litigation. Therefore, public policy supports upholding this agreement.

In Virginia, "[w]here an agreement is complete on its face and is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the terms of the instrument itself. This is so because the writing is the repository of the final agreement of the parties." *Lerner v. Guldesky Co.*, 230 Va. 124, 132 (1985). Therefore, parol evidence cannot be admitted in Virginia to interpret the meanings of clear and unambiguous contract terms. Here, the Court finds that the terms of the Sellers' Release are clear and unambiguous. As a result, it will not consider parol evidence in interpreting this provision. Finally, because the terms of the Sellers' Release are clear and unambiguous, the court will construe these terms "according to their plain meaning." *See Bridgestone/Firestone v. Prince William Square*, 250 Va. 402, 407 (1995).

## C. Interpretation of the Sellers' Release

The Sellers' Release states, in pertinent part, that

> *Each Seller, on behalf of itself and each of its . . . affiliates, successors and assigns . . .* hereby releases and forever discharges Buyer, the Company *and each of their respective . . . past, present and future Representatives, affiliates,* stockholders, members, controlling persons, successors and assigns . . . *from any and all*

> *claims*, demands, Proceedings, causes of action, Orders, obligations, contracts, agreements, debts and liabilities whatsoever, whether known or unknown . . . arising at any time prior to the Closing . . . or arising out of any matter, cause or event occurring at any time prior to the Closing . . . .

*Sellers' Release*, MEMBERSHIP INTEREST PURCHASE AGREEMENT (November 6, 2007) (emphasis added).

In order for this release to bar any claims in this suit, Grunley Walsh U.S. must qualify as a releasor under the following clause: "[e]ach Seller, on behalf of itself and each of its . . . affiliates, successors and assigns . . . ." Furthermore, Mr. Raap and GWMS must qualify as releasees. This would occur if Mr. Raap and GWMS were characterized as "past, present, [or] future Representatives [or] affiliates" of "the Company," which is defined by the Sellers' Release as Grunley Walsh International. If these parties are covered by the Sellers' Release in this manner, then it necessarily follows that Mr. Grunley and Mr. Walsh, through their individual corporations,[12] promised Mr. Farah that Grunley Walsh U.S. would release Mr. Raap and GWMS "from any and all claims" arising from facts occurring before the closing date of November 6, 2007.

### i. *Grunley Walsh U.S. as Releasor*

In this case, Grunley Walsh U.S. qualifies as a releasor because it is an "affiliate" of Sellers Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co. The Sellers' Release does not define "affiliate." However, "'[a]ffiliate' is a well-established term in the business context, and always denotes some significant degree of control between two entities." *Jermar, Inc. v. L.M. Commc'ns II of South Carolina, Inc.*, 181 F.3d 88, 1999 WL

---

[12]    Those individual corporations are Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co.

381817 at *4 (4th Cir. 1999) (unpublished); *see e.g.,* BLACK'S LAW DICTIONARY 63 (8th ed. 2004) (defining "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). Usage of the term "affiliate" in Virginia accords with these control-based definitions. *See, e.g.,* VA. CODE § 3.2-3200 ("'Affiliate' means any person or subsidiary thereof, who has, either directly or indirectly, actual or legal control over a distributor, whether by stock ownership or in any other manner."); VA. CODE § 13.1-729 ("'Affiliate' means a person who directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with another person or is a senior executive officer thereof"). Nothing in the Sellers' Release or the Membership Interest Purchase Agreement convinces the Court that the application of a control-based definition of "affiliate" is improper.

Here, Mr. Grunley and Mr. Walsh used Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co., respectively, to create Grunley Walsh U.S. *See Transfer Agreement*, Pl. Ex. 230 (January 1, 2007) ("the Member-Owners of [The Grunley Walsh, LLC], James V. Walsh Construction Co., LLC, and Kenneth M. Grunley Construction Co., LLC . . . have formed [Grunley Walsh U.S.] on December 15, 2006 for the purpose of performing construction contracting in the United States").[13] Therefore, it is indisputable that "Sellers" Kenneth M. Grunley Construction Co. and James V. Walsh Construction Co., through Mr. Grunley and Mr. Walsh, owned and controlled Grunley Walsh U.S. This ownership and control serves as the basis for the Court's conclusion that Grunley Walsh U.S. is an "affiliate" of these Sellers. And because Grunley Walsh U.S. is an "affiliate" of the "Sellers," it qualifies as a releasor under the Sellers' Release.

---

[13]     As mentioned above, Mr. Grunley and Mr. Walsh created Grunley Walsh U.S. in anticipation of entering into the Membership Interest Purchase Agreement with Mr. Farah.

*ii.  GWMS and Mr. Raap as Releasees*

Next, the Court must determine whether Mr. Raap and GWMS qualify as releasees under

the Sellers' Release. First, GWMS qualifies as a releasee because it is a "past affiliate" of "the

Company" Grunley Walsh International. This conclusion requires a careful tracking of the

various Grunley Walsh entities involved in this suit. Mr. Grunley and Mr. Walsh formed

Grunley Walsh Joint Venture in 1998 by merging Grunley Construction Co., Inc. and William V.

Walsh Construction, Inc. This entity changed names two times while under the ownership of

Mr. Grunley and Mr. Walsh: Grunley Walsh Joint Venture, LLC was changed to The Grunley

Walsh, LLC in 2004, and then to Grunley Walsh International, LLC on December 15, 2006 in

anticipation of entering into the Membership Interest Purchase Agreement. Mr. Grunley and Mr.

Walsh maintained co-ownership of the Grunley Walsh entity until they resigned from Grunley

Walsh International on November 6, 2007.[14]

Importantly, that Mr. Grunley and Mr. Walsh used various names to describe their

Grunley Walsh entity is of no legal relevance in this matter. "The change of a corporation's

name is not a change of the identity of a corporation and has no effect on the corporation's

property, rights, or liabilities." *Alley v. Miramon*, 614 F.2d 1372, 1384 (5th Cir. 1980); *see also*

*Wright-Caesar Tobacco Co. v. A. Hoen & Co.*, 54 S.E. 309, 311 (Va. 1906) (the Virginia

Supreme Court did not permit a company to avoid liability by changing its name where the

successor company was "but a continuation" of the first company); *Eng'g Assocs of New*

*England, Inc. v. B&L Liquidating Corp.*, 345 A.2d 900, 903 (N.H. 1975) ("The fact that the

---

[14]     In addition to resigning as officers of Grunley Walsh International on November
6, 2007, Mr. Grunley and Mr. Walsh resigned their individual corporations, Kenneth M. Grunley
Construction Co. and James V. Walsh Construction Co., respectively, from the membership of
Grunley Walsh International. *See Resignation Letters*, Pl. Ex. 226, A153-A156 (November 6,
2007).

defendant has changed its corporate name does not relieve it of any liability it may have incurred under its contract with the plaintiff."); 18A Am. Jur. 2d *Corporations* § 240 (2004); 18 C.J.S. *Corporations* § 140 (2007). Therefore, this Court views Grunley Walsh Joint Venture LLC, The Grunley Walsh LLC, and Grunley Walsh International LLC as one continuous corporate entity having the same corporate identity.[15]

This conclusion is critical in the present case. GWMS was formed in 2000, when the Grunley Walsh entity was operating under its Grunley Walsh Joint Venture name. Mr. Grunley and Mr. Walsh each owned 24.5% shares in GWMS until they sold those shares to Mr. Raap in 2002. As a result, between 2000 and 2002, it is indisputable that Mr. Grunley and Mr. Walsh had significant ownership in and control over GWMS, in addition to co-owning Grunley Walsh Joint Venture. Even more, GWMS and Grunley Walsh Joint Venture had a unique and close connection, since they both operated in the construction field and shared office space. The common ownership and close working connection between these two companies compel the Court to conclude that GWMS was, between 2000 and 2002, an affiliate of Grunley Walsh Joint Venture.[16] It necessarily follows, then, that GWMS qualifies as a "past affiliate" of "the Company" Grunley Walsh International, since Grunley Walsh Joint Venture and Grunley Walsh

---

[15]     Worth noting is that the Court is not addressing the issue of whether changing the type of corporate *entity* has any legal effect (*e.g.,* changing from a limited liability corporation to a partnership). Instead, the Court is addressing the impact of a corporate name change only, where the type of corporate entity remains the same. Here, the Grunley Walsh entity's limited liability corporation status remained constant while the entity changed names from Grunley Walsh Joint Venture, LLC to The Grunley Walsh, LLC, and then to Grunley Walsh International, LLC.

[16]     In reaching this conclusion, the Court considers the control-based definition of affiliate outlined above.

International are the same corporate entity. Because GWMS qualifies as a past affiliate of Grunley Walsh International, GWMS is a releasee under the Sellers' Release.[17]

Additionally, GWMS qualifies as an affiliate of Grunley Walsh International on other grounds. Between December 15, 2006, the date that Grunley Walsh International was formed, and May 30, 2007, the date Mr. Raap was fired, Mr. Raap served simultaneously as the owner of GWMS and President of Grunley Walsh International. Therefore, it is indisputable that a single individual possessed significant amounts of control over both companies during that span of time. It is this shared control that supports the conclusion that GWMS was a direct affiliate of Grunley Walsh International between December 15, 2006 and May 30, 2007. Therefore, GWMS qualifies as a releasee under the Sellers' Release on these grounds, as well.

Finally, Mr. Raap unquestionably qualifies as a "past Representative" of all three Grunley Walsh iterations that existed between 1998 and 2007, including Grunley Walsh International (i.e. "the Company").[18] Specifically, Mr. Raap began working as President of Grunley Walsh Joint Venture in 1998 and was serving in this same capacity when Grunley Walsh International was formed on December 15, 2006.[19] Mr. Raap continued working as President of Grunley Walsh International for over five months until he was fired on May 30, 2007. For these reasons, Mr. Raap is covered by the "past Representative" language and thus qualifies, individually, as a releasee under the Sellers' Release.

---

[17]     The Court believes that this result is legally unavoidable. Restricting the "past, present and future . . . affiliate[]" language to include only affiliates of Grunley Walsh International LLC and not Grunley Walsh Joint Venture LLC or The Grunley Walsh LLC would exalt form over substance and permit the Grunley Walsh entity to evade the legal consequences of its corporate actions through corporate name changing.
[18]     "Representative" is defined in the Membership Interest Purchase Agreement to mean "a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants and financial advisors."
[19]     *See Articles of Amendment of The Grunley Walsh, LLC*, Pl. Ex. 226 (December 15, 2006).

*iii. Scope and Effect of the Sellers' Release on the Claims of this case.*

In sum, Grunley Walsh U.S. qualifies as a releasor under the Sellers' Release, and Mr.

Raap and GWMS qualify as releasees.  In the Release, the releasors (defined in the agreement as

"Related Parties") released and discharged the releasees "from any and all claims" arising from

facts occurring before the closing date of November 6, 2007.  The "any and all claims" language

is extremely broad, and is subjected to only a minor qualification, which is that the release

agreement does not release Mr. Farah and FJK Holdings ("the Buyer") from obligations arising

under the Membership Interest Purchase Agreement itself.  This qualification, however, has no

impact in the present case because it only applies to the "Buyer" Mr. Farah and FJK Holdings,

and not to GWMS or Mr. Raap.

Grunley Walsh U.S. argues that many of the acts committed by Mr. Raap were outside

the scope of his employment with Grunley Walsh International, and that these acts are not

covered by the Sellers' Release.  The Court disagrees with Grunley Walsh U.S.'s argument.  The

Sellers Release contains no language supporting, or even hinting, that the Sellers Release should

be restricted in this manner.  Indeed, the only qualification in the extremely broad Sellers'

Release is outlined in the previous paragraph and makes no mention of a scope of employment

limitation.  Because the only qualification in the plain language of the release has no impact on

Mr. Raap or GWMS, and since the release broadly releases the parties from "any and all claims,"

the Court holds that Grunley Walsh U.S. released GWMS and Mr. Raap from the claims it filed

in this suit, to the extent those claims arose from facts occurring on or before the closing date of

November 6, 2007.

**D. Claims arising from facts after November 6, 2007**

Consistent with its holding in this Memorandum Opinion, the Court issued an Order on April 14, 2009 dismissing Grunley Walsh U.S.'s Counts I-V and VIII-IX to the extent that those claims arose from facts occurring on or before November 6, 2007.[20] In that Order, the Court instructed the parties to file written responses defining which, if any, of Counts I-V or VIII-IX were supported by facts arising after November 6, 2007.

Mr. Raap and GWMS's response argued that all of these counts were based on facts occurring on or before November 6, 2007. Grunley Walsh U.S. agreed with this conclusion as it pertains to Counts V, VIII, and IX. Therefore, summary judgment shall be granted in full on these three claims. However, Grunley Walsh U.S. presented facts relevant to Counts I-IV (the federal and state trademark and unfair competition claims) that occurred after November 6, 2007. Specifically, Grunley Walsh U.S. explained that third parties were confused *after* November 6, 2007 because of Mr. Raap and GWMS's infringing uses of the GRUNLEY WALSH mark that took place *before* November 6, 2007.

Even if this is true, Counts I-IV would not be able to survive summary judgment. In order for Grunley Walsh U.S. to succeed on its federal and state trademark and unfair competition claims, it must be able to support all claim elements with facts in the record arising after November 6, 2007. One essential element common to each trademark and unfair competition claim in this case is the following: the defendants must actually *use* the plaintiff's mark. *See, e.g., Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (federal trademark infringement and unfair competition claims brought under 15 U.S.C. § 1125(a) have "virtually identical elements." One such element is that

---

[20]     Pursuant to Grunley Walsh U.S.'s Stipulation of Dismissal, the Court also dismissed Counts VI and VII in their entirety.

the defendants use the trademark in connection with goods or services.); *Louis Vuitton Malletier v. Haute Diggity Dog*, 507 F.3d 252, 259 (4th Cir. 2007) (to succeed on a federal trademark infringement claim, plaintiff must prove that defendant used a reproduction, counterfeit, copy, or colorable imitation of that mark in commerce without plaintiff's consent). *Int'l Income Props., Inc. v. Combined Props. Ltd. P'ship.*, 1987 WL 488607 at *1 (Va. Cir. Ct. 1987) (in order for a defendant to be liable for unfair competition with respect to a trade name, that defendant must "unfairly use[] the name or a simulation of it."); *Brittingham v. Jenkins*, 914 F.2d 447, 455 (4th Cir. 1990) (when analyzing a common law trademark infringement claim, the Court explained: "[a]s a general rule, the use of an appropriated mark without the permission of its owner . . . constitutes an infringement if the unauthorized use is likely to result or has resulted in confusion, mistake or deception on the part of the consumer.").

Here, as Grunley Walsh U.S. admits, none of the infringing uses that it accuses Mr. Raap and GWMS of committing occurred after November 6, 2007. Therefore, the "use" element common to the trademark and unfair competition claims in this case are not met. Accordingly, summary judgment shall be granted in full on the trademark and unfair competition claims (Counts I-IV).

## V. CONCLUSION

For the reasons stated in the Sellers' Release portion of this Memorandum Opinion ( *i.e.*, Section IV. A-C), Plaintiff's Counts I-V and VIII-IX were dismissed on April 14, 2009 to the extent that these counts arose from facts occurring before November 6, 2007. For the reasons stated in Section IV.D, none of Plaintiff's claims can succeed based on the facts in the record arising after November 6, 2007. Therefore, Defendants' motion for summary judgment shall be

granted in full on Counts I-V and VIII-IX.  Accordingly, these claims shall be dismissed in their entirety.


ENTERED this 6th day of May, 2009.


Alexandria, Virginia

_____/s/_____

Liam O'Grady
United States District Judge
